IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KELLY M. EARL,                    )
                                  )
                Plaintiff,        )
                                  )
v.                                )          Action No. 2:17cv546
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner,              )
Social Security Administration,   )
                                  )
                Defendant.        )
                                  )

## REPORT AND RECOMMENDATION

This matter is before the Court on *pro se* Plaintiff Kelly M. Earl's ("Plaintiff")

Complaint, ECF No. 3, filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final

decision of the Defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security

Administration ("the Commissioner"), denying Plaintiff's claim for Supplemental Security

Disability Income ("SSDI") under the Social Security Act ("SSA").  Plaintiff filed a Motion for

Summary Judgment and memorandum in support, ECF No. 11, and the Commissioner filed a

cross-Motion for Summary Judgment and Memorandum in Support, ECF Nos. 13-14, which are

now ready for recommended disposition.  This action was referred to the undersigned United

States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal

Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2,

2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges.

After reviewing the briefs, the undersigned makes this recommendation without a hearing

pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J).  For the following

reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 11, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 13, be **GRANTED**, and the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

On June 12, 2013, Plaintiff protectively filed her application for SSDI, alleging an onset date of September 1, 2004. R. at 176, 206.[1]  Her application was initially denied on September 16, 2014, and again denied upon reconsideration on October 30, 2014. R. at 110-14, 118-22. Plaintiff then requested a hearing in front of an administrative law judge, which was conducted on July 21, 2016. R. at 30. Because Plaintiff was unrepresented, The Administrative Law Judge Stewart Goldstein ("the ALJ"), continued the hearing to permit Plaintiff to obtain representation. R. at 33-34. Plaintiff did not obtain representation and the ALJ proceeded with the hearing on October 4, 2016. R. at 38-63. On November 1, 2016, the ALJ issued a decision denying Plaintiff's SSDI application. R. at 12-23. Plaintiff then filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied by the Appeals Council on August 18, 2017. R. at 1-5. The Appeals Council denied Plaintiff's request for review because the Appeals Council found no reason under the rules to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. at 1.

Having exhausted her administrative remedies, on October 20, 2017, Plaintiff filed the instant Complaint for judicial review of the Commissioner's decision. ECF No. 1. The Commissioner filed an Answer on January 3, 2018. ECF No. 6. The matter was referred to the undersigned U.S. Magistrate Judge ("the undersigned") on January 9, 2018. ECF No. 8.

---

[1] "R." refers to the certified administrative record that was filed under seal on January 3, 2018, ECF No. 7, pursuant to Local Civil Rules 5(B) and 7(C)(1).

Plaintiff filed her Motion for Summary Judgment on February 8, 2018, ECF No. 11, and the Commissioner filed a cross-Motion for Summary Judgment and a Memorandum in Support on March 9, 2018, ECF Nos. 13-14. The matter is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff was born on June 14, 1973, and was thirty-one years old at the time of her alleged disability onset date, making her a "younger individual" under the SSA's regulations. *See* R. at 74. *See also* 20 C.F.R. § 416.963(c) (defining anyone under the age of fifty as a "younger person."). On October 4, 2016, Plaintiff appeared *pro se* and testified before the ALJ at the administrative hearing. R. at 38, 42-56. The Plaintiff's boyfriend, Michael Howland, R. at 38, 56-57, and Robert Edwards, an impartial vocational expert ("VE"), R. at 38, 57-60, also appeared and testified. The record included the following factual background for the ALJ to review:

Plaintiff completed two years of college and received a certification for OR technician in 2002. R. at 42. Plaintiff testified that she previously worked as Sentara Healthcare beginning in 1995 and that between 2001 and 2003 she did admitting and registration until she began working in the operating room in January of 2003. R. at 42-43. Plaintiff stated she was recently divorced and that her husband got custody of their children. R. at 47. Plaintiff stated she has two dogs, who she cares for unless her boyfriend is home. R. at 51.

Related to her alleged mental impairments, Plaintiff stated she ultimately left her job at Sentara due to headaches, concentration problems, and memory loss and because she was missing too much work, causing her to get written up. R. at 43-44. Plaintiff stated that her headaches, fatigue, depression, concentration and memory problems have all progressively worsened since 2004. R. at 45-47. Plaintiff testified that on a bad headache day she will lay in

bed all day, but on a typical day she does crafts, watches T.V., takes her dogs for a walk, plays with the dogs, texts with friends or family, and does light housework. R. at 52. Plaintiff stated she keeps in touch with her kids on the computer, uses Facebook, and plays games and listens to music on the computer. R. at 54. Plaintiff also testified she washes dishes and she typically grocery shops when her boyfriend is present. R. at 53. Plaintiff stated that socially she visits with friends and relatives, plays board games, card games, goes out to eat, and goes out for coffee. R. at 53-54.

## A. Evidence Relevant to Plaintiff's Alleged Headaches

On June 24, 2003, Plaintiff saw Dr. Mary Bowles, M.D., neurologist, for reported headaches. R. at 421. Dr. Bowles performed neurologic and physical examinations which were normal, but Dr. Bowles believed Plaintiff's symptoms suggested pseudotumor cerebri.[2] R. at 423. Dr. Bowles performed a lumbar puncture procedure which demonstrated an opening pressure of 39 cm of water.[3] R. at 423. An August 25, 2003 cerebral magnetic resonance venogram revealed a pseudotumor cerebri with bilateral symmetric stenosis of the junction of transverse and sigmoid sinus. R. at 381. Plaintiff also had a brain MRI with normal results. R. at 381.

In November 2003, Plaintiff underwent an endovascular dilation stenting procedure to her right transverse sinus. R at 21, 379-80, 398, 1026. Following this procedure Plaintiff experienced dramatic improvement in her headaches and resolution of papilledema.[4] R. at 398.

---

[2] Pseudotumor cerebri is a condition caused by venous sinus occlusion and cerebral edema associated with a number of pathological conditions, marked by raised intracranial pressure with normal cerebrospinal fluid, headaches, nausea, vomiting, and papilledema, but without neurological signs except occasional abducens paralysis. WILLIAM NEWMAN, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1537 (30th ed. 2003).
[3] This falls outside the normal range, which is between five and twenty-five cm. S. Lee and C. Lueck, *Cerebrospinal Fluid Pressure in Adults*, 34(3) J. NEUROOPHTHALMOL 278-83 (2014).
[4] Papilledema is edema of the optic disk (papilla), and is most commonly due to increased intracranial pressure, malignant hypertension, or thrombosis of the central retinal vein. NEWMAN at 1359.

On April 2, 2004, Plaintiff saw Dr. Sidney Mallenbaum, M.D., neurologist, and told Dr. Mallenbaum that her headaches were "not that severe," and that she was "able to function." R. at 1202. On May 14, 2004, Plaintiff reported her headaches did not feel like migraines and Dr. Mallenbaum found Plaintiff's optic disc margins to be clear. R. at 1201. On June 25, 2004, Dr. Mallenbaum noted that Plaintiff's headaches had improved with the previously prescribed medication Topamax but that Plaintiff stopped taking that medication because her headaches resolved after the stenting procedure. R. at 1199. Dr. Mellenbaum believed Plaintiff's renewed headaches were caused by mixed tension/vascular headache syndrome. R. at 1199.

On July 22, 2004, Plaintiff was referred by Dr. John Angola, M.D., for a consultation with Dr. Thomas Pellegrino, M.D., neurologist, and colleague of Dr. Bowles. R. at 398, 421-23. On physical examination, Dr. Pellegrino noted Plaintiff was friendly, alert, and in no evident distress, but had complaints of a mild headache. R at 399. Dr. Pellegrino noted Plaintiff's speech was clear, well-articulated, and language function was normal, as well as normal and symmetric eye movements and normal and symmetric pupillary light reflexes. R. at 399. Dr. Pellegrino performed a fundoscopic examination, which was normal but for slight blurring of the disk margins on the right side compared to the left, but absent elevation of the disks. R. at 399. The remainder of Plaintiff's neurologic examination was normal. R. at 399. Dr. Pellegrino noted that CT venograms showed a dramatic improvement in the transverse sinus stenosis with essentially normal or above normal caliber of the vessels and noted that Dr. Agola recommended a repeat CT venogram to look for any evidence of restenosis on the previously treated right sinus. R. at 399.

Plaintiff continued to treat with Dr. Pellegrino on Dr. Agola's referral and on September 3, 2004, Dr. Pellegrino noted Plaintiff appeared to be in moderate discomfort related to her

reported headache. R. at 401. Dr. Pellegrino performed physical and neurological examinations, and both were normal. R. at 401. Plaintiff also saw Dr. Samuel Garrett, M.D., ophthalmologist at Virginia Beach Eye Center, on this same date. R. at 429. Dr. Garrett noted that Plaintiff had no gross papilledema. R. at 429.

On September 20, 2004, Plaintiff presented to Dr. Pellegrino for a lumbar puncture procedure and the results of this procedure showed opening pressure of 220 mm of water.[5] R. at 402.

On October 25, 2004, Dr. Pellegrino found no significant findings but recommended changing Plaintiff's medication regimen by reducing Acetazolamide and starting her on Topiramate. R. at 403.

On November 18, 2004, a lumbar puncture procedure again revealed an opening pressure of 220 mm of water. R. at 406. Dr. Pellegrino also conducted physical and neurological examinations which were unremarkable. R. at 405. Plaintiff had normal funduscopic examination and no papilledema. R. at 406. Dr. Pellegrino noted that on Plaintiff's last visit she saw "Dr. [Ellen] Cullom [for a neuroophthalmology evaluation, who] did not find any papilledema or other evidence of raised intracranial pressure; visual function was normal" and recommended that Plaintiff proceed to discontinue Acetazolamide. R. at 406.

On December 2, 2004, Plaintiff returned for a chronic headache follow-up with Dr. Pellegrino who noted Plaintiff appeared awake, alert, and in good spirits. R. at 407. Dr. Pellegrino notes that Plaintiff has no current diagnosis and no specific changes. R. at 407. Plaintiff explained that her headaches do not disturb her vision but are worse in the morning with a pressure-like sensation that improves throughout the day. R. at 407.

---

[5] This falls within the normal range which is between 60 mm and 200 mm is regarded as normal, but normal findings can be as high as 250 mm for overweight individuals. Carolyn M. Doherty and Raeburn B. Forbes, *Diagnostic Lumbar Puncture*, 83(2) ULSTER MED. J. 93-102 (2014).

On January 6, 2005, an office note of Dr. David Waters indicated Plaintiff returned for a report of diagnostic studies which showed Plaintiff no longer had pseudotumor cerebri.  R at 411.  Dr. Waters conferred with Dr. Pellegrino and agreed that Plaintiff's complained-of headache symptoms appear as chronic muscular tension headaches and future lumbar puncture procedures were unnecessary and should be discontinued.  R. at 411.

On January 12, 2005, Dr. Pellegrino again concluded that Plaintiff's "clinical picture is most consistent with a chronic tension headache syndrome."  R. at 408.  Plaintiff's examinations were unremarkable and normal; Plaintiff was instructed to continue medications.  R. at 408.

On February 16, 2005, Dr. Michael Swatts, O.D., optometrist at First Colonial Eye Center, noted that Plaintiff had normal corrected vision with no signs of papilledema.  R. at 426-27.

On March 25, 2005, Dr. Pellegrino noted Plaintiff had an unremarkable examination.  R. at 410.  Plaintiff's fundoscopic examination was normal and there was no evidence of raised intracranial pressure, no SVPs, and no changes in vision.  R. at 410.  Dr. Pellegrino again assessed Plaintiff was likely experiencing chronic tension headache syndrome.  R. at 412.

On April 11, 2005, Dr. Pellegrino referred Plaintiff to Dr. Jeffrey Elias, M.D., assistant professor of neurological surgery at the University of Virginia, and briefly referenced Plaintiff's history; namely that following July 2004 Plaintiff underwent repeat venous angiography testing and results were essentially normal and there is no evidence of papilledema on several examinations.  R. at 397.

On April 12, 2005, Dr. Elias saw Plaintiff and noted her neurologic examination was entirely normal.  R. at 467.  Dr. Elias observed Plaintiff's transverse sinus stenosis had been dilated and stented successfully in November 2003 and that this subdued her headaches for six

weeks before returning.  R. at 467.  Dr. Elias stated Plaintiff had seen no improvement with Topamax or Diamox and currently was not on medication for her headaches.  R. at 467.  Plaintiff told Dr. Elias that her headaches improve with lumbar punctures.  R. at 467.  Dr. Elias believed Plaintiff may have an intercranial pressure problem and may benefit from intracranial pressure monitoring, noting however, that this was not urgent as her vision was preserved and she had no disc problems.  R. at 467.

On September 27, 2005, Dr. Douglas Rampona, M.D., ophthalmologist with First Colonial Eye Center, saw Plaintiff on an Urgent Care Center referral.  R. at 1190.  Dr. Rampona noted that an eye examination for pseudotumor cerebri was unremarkable, automated visual field analysis revealed trace nasal visual field depression to the right eye, and the left eye was completely clear.  R. at 1190.  He noted that Plaintiff's previous papilledema had resolved, and her optic nerves looked healthy.  R. at 1191.

On November 30, 2005, Plaintiff saw Dr. Eric Goldberg, M.D., neurologist/psychiatrist, for her headaches also on referral from the Urgent Care Center.  R. at 490.  Dr. Goldberg noted Plaintiff was in no apparent distress and physical and neurological examinations were normal. R. at 490-91.  Dr. Goldberg prescribed her Topamax.  R. at 491-92.

October 25, 2006, Plaintiff saw Dr. Goldberg again with complaints of "recent recurrence in everything including the headaches."  R. at 489.  Dr. Goldberg conducted laboratory tests which were unremarkable, and Plaintiff's neurologic examination was normal and unchanged. R. at 489.  Dr. Goldberg discussed possible treatment options and prescribed Diamox.  R. at 489.

On March 3, 2011, Plaintiff returned to Dr. Swatts who found Plaintiff' had 20/20 vision, with no signs of edema or continued symptoms from pseudotumor cerebri, noting that her condition was under "good control."  R. at 714-15. 26.

8

On April 8, 2011, Dr. Rampona concluded that Plaintiff's non-insulin diabetes was well controlled, that her vision was easily correctable to 20/20, she had clear anterior segments, 0.15 cup-to-disc ratios OD and OS respectively, spontaneous venous pulsation, and appeared to be doing very well. R. at 1163.

## B. Evidence Relevant to Plaintiff's Alleged Depression

Plaintiff sought psychiatric treatment for transitory problems involving marital, financial, immediate family, and extended family issues with Pegasus Psychiatric and Wellness Clinic. R. at 1070-96, 1105-18. On December 22, 2008, Plaintiff first saw Dr. Rebecca Barchas, M.D., psychiatrist. R. at 1118.

In 2009, first on January 19, 2009, Dr. Barchas met with Plaintiff who complained of problems with her stepson. R. at 1118. Dr. Barchas noted Plaintiff had symptoms of anxiety and depression that was unchanged/stable and Plaintiff was instructed to maintain medications, including Lunesta and Wellbutrin. R. at 1096. On April 13, 2009, Plaintiff and Dr. Barchas discussed plans to pay off debt, save money, move out, and try for joint custody. R. at 1117. Dr. Barchas noted that Plaintiff was working several part-time jobs, including doing medical billing. R. at 1117. Dr. Barchas found symptoms of anxiety that were improving. R. at 1096. On May 25, 2009, Dr. Barchas modified Plaintiff's medications, noted Plaintiff's multiple complaints, and determined Plaintiff had symptoms of depression that were unchanged/stable. R. at 1095. On July 2, 2009, Dr. Barchas noted symptoms of anxiety and depression that had improved. R. at 1095. On this date, Plaintiff reported feeling better and less tired, but worried about her daughter getting a poor grade. R. at 1095, 1116. On July 28, 2009, Plaintiff presented with numerous familial concerns. R. at 1116. Dr. Barchas noted that Plaintiff was extremely stressed but "handling it amazingly well." R. at 1094. On September 8, 2009, Dr. Barchas noted

Plaintiff's complaints of her 15-year-old daughter who had been engaging in bad behavior, as well as other situations regarding her children that were a source of stress. R. at 1115. Dr. Barchas again recounted Plaintiff's family stressors which were ongoing since the beginning of August, which increased Plaintiff's anxiety level and caused a lot of headaches. R. at 1094. Dr. Barchas found symptoms of depression and anxiety, noting that her anxiety had increased because Plaintiff had a lot on her plate. R. at 1094. On October 6, 2009, Dr. Barchas noted that Plaintiff's 15-year-old daughter was working hard to rebuild trust between her and Plaintiff. R. at 1115. Dr. Barchas noted symptoms of anxiety, depression, mania, and anger, which was unchanged/stable and further noted that Plaintiff was feeling guilty about being negative and yelling at her kids. R. at 1093. On November 4, 2009, Plaintiff reported to Dr. Barchas that she and her husband had good success reducing their debt and Plaintiff was rebuilding trust with her daughter. R. at 1114. Plaintiff told Dr. Barchas that she had an ovarian cyst, but Dr. Barchas noted Plaintiff had a positive attitude about it and a positive attitude overall. R. at 1093. Dr. Barchas noted symptoms of anxiety and depression that were improving. R. at 1093. On December 29, 2009, Dr. Barchas noted Plaintiff was a very good parent and a voice of reason. R. at 1114. Dr. Barchas noted Plaintiff was worn out by holiday stress but kept a good perspective. R. at 1092. Plaintiff reported having twenty-four people in her home for Christmas, and that her 15-year-old daughter's boyfriend was making progress. R. at 1114. Dr. Barchas noted symptoms of anxiety and depression that were improving. R. at 1092.

In 2010, first on January 26, 2010, Plaintiff reported feeling at peace with interpersonal issues. R. at 1113. Dr. Barchas noted no symptoms but indicated improvement. R. at 1092. On February 23, 2010, Plaintiff complained that situational stressors were made worse by her husband being out of town. R. at 1113. Dr. Barchas noted Plaintiff verbalized having "suicidal

thoughts" for the prior three weeks that were initially fleeting but became more intense. R. at 1092. Plaintiff complained of excessive sleeping while her husband was out of town and that she was behind at work. R. at 1092. Dr. Barchas modified Plaintiff's medications including introducing Lithium and noted Plaintiff, who had been improving for some period, was now regressing. R. at 1092. On March 10, 2010, Plaintiff reported the Lithium had helped to stop Plaintiff's suicidal thoughts. R. at 1091. Dr. Barchas noted Plaintiff's overeating and observed that she had gained forty pounds in six months. R. at 1091. Dr. Barchas noted symptoms of anxiety and depression that were improving. R. at 1091. On April 6, 2010, Plaintiff told Dr. Barchas she had taken four days off by herself and went to the beach. R. at 1091. Plaintiff reported that her sister was ill and made several complaints about her sister's family. R. at 1112. Dr. Barchas noted no symptoms but indicated improvement. R. at 1091. On April 20, 2010, Dr. Barchas noted Plaintiff was "in much better space because of the addition of the Lithium" and "has much better perspective now." R. at 1090. Dr. Barchas noted no symptoms but indicated Plaintiff was much improved. R. at 1092. On May 18, 2010, Plaintiff again complained of financial worries and her weight, noting stress as a result of traveling for a competition her daughter was in. R. at 1111. Dr. Barchas noted Plaintiff had no suicidal thoughts on Lithium. R. at 1090. Dr. Barchas noted no symptoms but indicated Plaintiff was unchanged/stable. R. at 1090. On June 15, 2010, Plaintiff announced she was leaving her job and her husband, reporting that she was happy when she was home by herself. R. at 1110. Dr. Barchas noted symptoms of anxiety that were improving. R. at 1090. On August 10, 2010, Plaintiff reported much marital and job tension. R. at 1089. She had a fight with her husband and took her children to Indiana for a week. R. at 1110. She stated she was now unemployed. R. at 1110. Dr. Barchas noted symptoms of anxiety and depression that were stable/unchanged. R. at 1089. On October 5,

2010, Plaintiff reported that her relationship with her husband was better. R. at 1109. Dr. Barchas noted Plaintiff was "less depressed now" and wished to discontinue Lithium. R. at 1089. Dr. Barchas noted no symptoms but stated Plaintiff was much improved. R. at 1089. On November 2, 2010, Plaintiff reported she got a part-time job and got a lot of validation from that job. R. at 1109. Dr. Barchas noted no symptoms, but noted Plaintiff was improving, had a happy mood, and was content. R. at 1088. On November 30, 2010, Dr. Barchas noted no symptoms but stated Plaintiff was much improved. R. at 1088.

In 2011, first on January 25, 2011, Plaintiff reported an improved relationship with her husband, but indicated difficulty with her stepson. R. at 1108. Dr. Barchas noted no symptoms but stated Plaintiff was improving despite health and family issues. R. at 1088. On March 22, 2011, Plaintiff indicating feeling displeased with her husband and his treatment of her. R. at 1107. Dr. Barchas noted no symptoms but stated Plaintiff was much improved. R. at 1087. On April 21, 2011, Plaintiff discussed vacationing with her husband and three daughters. R. at 1087. Plaintiff also discussed problems with her stepson. R. at 1107. Dr. Barchas noted Plaintiff was in a "good space," with no symptoms, and that she was much improved. R. at 1087. On May 17, 2011, Plaintiff reported that she "has been totally absorbed [with her] sister's health issues" and reported work being stressful. R. at 1106. On June 14, 2011, Plaintiff discussed being unhappy with her husband and stepson. R. at 1106. Dr. Barchas noted Plaintiff had gained fifty pounds and was experiencing symptoms of anxiety. R. at 1086. On August 9, 2011, Plaintiff discussed her children's academic achievements. R. at 1105. Plaintiff's mood was "ok" and she was very tired again. R. at 1086. Dr. Barchas noted no symptoms but stated Plaintiff was improving. R. at 1086. On October 4, 2011, Plaintiff complained at length about her husband. R. at 1105. Dr. Barchas noted Plaintiff's depression was worse partially because of Plaintiff's

physical condition (headaches), and Plaintiff had symptoms of depression and anxiety that were unchanged/stable. R. at 1085. On November 28, 2011, Plaintiff complained of fatigue and indicated she was sleeping ten to twelve hours a night. R. at 1084. Dr. Barchas noted no symptoms. R. at 1084. On December 27, 2011, Dr. Barchas noted symptoms of anxiety that were improving. R. at 1084.

In 2012, first on January 24, 2012, Plaintiff discussed her daughter applying to college and discussed her other children. R. at 1103. Dr. Barchas noted no symptoms. R. at 1084. On March 20, 2012, Plaintiff complained of fatigue despite sleeping fourteen hours per day. R. at 1083. Dr. Barchas noted symptoms of depression and anxiety that were improving. R. at 1083. On April 17, 2012, Plaintiff discussed financial and marital problems. R. at 1102. Dr. Barchas noted that Plaintiff had gained more weight, still felt tired, and her depression was increased as a result of Plaintiff's family problems. R. at 1083. Dr. Barchas noted symptoms of depression and anxiety that was regressing. R. at 1083. On May 15, 2012, Plaintiff discussed her daughter's high school graduation and celebrating her fifteenth wedding anniversary. R. at 1102. Dr. Barchas noted no symptoms, but indicated Plaintiff was much improved. R. at 1083. On June 12, 2012, Plaintiff discussed being inundated with out of town family visiting. R. at 1101. Dr. Barchas noted no symptoms, but indicated Plaintiff was much improved. R. at 1082. On July 10, 2012, Plaintiff discussed getting her three children into therapy for depression and ADD but was excited for her oldest daughter to start school at ODU in the fall. R. at 1101. Dr. Barchas noted symptoms of anxiety and depression, but indicated Plaintiff was improving. R. at 1082. On September 4, 2012, Plaintiff discussed problems with her stepson. R. at 1100. Dr. Barchas noted no symptoms, but indicated Plaintiff was improving. R. at 1082. On October 2, 2012, Plaintiff discussed being in pain all the time, having fatigue, and experiencing muscle spasms.

13

R. at 1081. Plaintiff discussed further problems with her husband. R. at 1100. Dr. Barchas noted symptoms of anxiety, but indicated Plaintiff was improving. R. at 1081. On November 29, 2012, Plaintiff complained of feeling fatigued but could not sleep. R. at 1081. Plaintiff complained of marital problems. R. at 1099. Dr. Barchas noted symptoms of anxiety, but indicated Plaintiff was improving. R. at 1081. On December 26, 2012, Plaintiff complained of continued problems with fatigue. R. at 1080. Plaintiff complained of problems with her husband and stepson. R. at 1099. Dr. Barchas noted symptoms of anxiety and depression but did not indicate Plaintiff's progress. R. at 1080.

In 2013, first on January 22, 2013, Plaintiff indicated feeling fatigued despite getting ten hours of sleep per night. R. at 1080. Dr. Barchas noted no symptoms. R. at 1080. Plaintiff discussed the possibility of separating from her husband. R. at 1098. On March 18, 2013 Plaintiff decided to stay in her marriage. R. at 1098. Dr. Barchas noted no symptoms, but indicated Plaintiff was improving. R. at 1080. On April 16, 2013, Plaintiff discussed her mother-in-law getting diagnosed with cancer. R. at 1097. Dr. Barchas noted Plaintiff was in a "good space" and identified no symptoms, but stated Plaintiff was improving. R. 1080. Plaintiff has no other psychiatric records related to her alleged depression.

At the hearing, the VE was presented with a total of four hypotheticals. The first hypothetical presented asked the VE to assume an individual of Plaintiff's age, education, and work experience, limited to light work with frequent balancing, occasional climbing of ramps and stairs, and occasional stooping, crouching, kneeling, and crawling, no working around hazards such as unprotected heights, and no climbing of ladders, ropes, or scaffolds. R. at 58. The VE testified that such an individual could perform Plaintiff's past work as an admitting clerk and surgical technician. R. at 58. For the second hypothetical, the VE testified that, assuming

the same hypothetical individual, but with a sedentary exertional capacity, such an individual could perform Plaintiff's past work as an admitting clerk. R. at 59. For the third hypothetical, the VE testified that, considering either of the first two hypothetical individuals, but with the added limitation that the individual would be off-task more than 15% of the work day due to symptoms, such an individual could not perform Plaintiff's past work or any other work. R. at 59. For the fourth hypothetical, the VE testified that, considering either of the first two hypothetical individuals, but with the added limitation that the individual miss three or more days each month on a consistent basis, such an individual could not perform Plaintiff's past work or any other work. R. at 59.

### III.  THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if:

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-00357, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v.*

*Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at \*10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of September 1, 2004 through her date last insured of September 30, 2011. R. at 14. Second, the ALJ determined that Plaintiff suffered from the following severe impairments: obesity, headaches, and degenerative disc disease. R. at 14. The aforementioned impairments were found to be severe as they caused more than minimal limitations in the Plaintiff's ability to perform basic work activities. R. at 14. To the extent that Plaintiff alleged other impairments, including: sinusitis, polycystic ovarian disease, hyperlipidemia, non-insulin dependent diabetes, left ankle ganglion cyst with minor inflammation, sleep apnea, history of pseudotumor cerebri, and hypertension, the ALJ found such impairments to be non-severe because they either did not exist for a continuous period of twelve months, were responsive to medication, did not did require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations. R. at 15.

With respect to Plaintiff's medically determinable mental impairments of depression and anxiety, the ALJ found that when considered singly and/or in combination, these did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and

16

were therefore non-severe. R. at 15. Specifically, the ALJ found that Plaintiff's mental limitations did not satisfy "paragraph B" criteria because Plaintiff suffered no limitations to activities of daily living; no limitations to social functioning; no limitations to concentration, persistence, and pace; and Plaintiff experienced no episodes of decompensation that had been of extended duration. R. at 15. The ALJ determined that, based on the "paragraph B" criteria that Plaintiff's medically determinable mental impairments caused no more than mild limitation. R. at 16.

Regarding Plaintiff's migraine headaches, the ALJ found that Plaintiff's migraines did not meet the requirements of Listing 11.02 regarding convulsive epilepsy because she did not have seizures occurring at least once a month in spite of three months treatment. R. at 17. The ALJ further found Plaintiff's migraines did not meet the requirements of Listing 11.03 regarding nonconvulsive epilepsy because she did not have seizures occurring more frequently than once per week in spite of at least three months of prescribed treatment. R. at 17.

Third, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by the SSA regulations, except that Plaintiff could frequently balance, she could occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl, she could not work around hazards such as unprotected heights, and she could not climb ladders, ropes, and scaffolds. R. at 17.

While the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Plaintiff, the ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 20.

The ALJ noted that objective medical evidence did not support a finding that Plaintiff's migraines were as limiting as alleged during the relevant period. R. at 21. The ALJ noted that her 2003 pseudotumor was resolved with stenting and her MRIs after that procedure were normal. R. at 21. Additionally, the ALJ stated Plaintiff did not seek emergency care for her headaches, her headaches improved with medication, and were managed. R. at 21. The ALJ noted that Plaintiff's neurologist discontinued intercranial monitoring because her examination showed no evidence of pseudotumor cerebri, her neurological examinations were normal, she reported having "a couple" of alcoholic drinks per night, and she did not continue with Botox injections despite her allegedly chronic migraines. R. at 21. The ALJ determined that Plaintiff's relatively mild findings and lack of treatment cast doubt on Plaintiff's allegations of disability. R. at 21. More broadly, the ALJ notes that the record revealed Plaintiff experienced approximately the same level of severity prior to her alleged onset date, and the fact that Plaintiff's impairments did not prevent her from working at that time strongly suggested they would not prevent her from working now. R. at 21. The ALJ also indicated that Plaintiff's activities of daily living did not support that she is as limited as is alleged because she was able to do arts and crafts, care for and walk her dogs, watch television, text friends and family, perform light housework, go out with her friends to restaurants, play board games, and play computer games. R. at 21.

Fourth, the ALJ determined that, through the date last insured, Plaintiff was capable of performing her past relevant work as a hospital admitting clerk and operating room technician as this work did not require the performance of work-related activates precluded by Plaintiff's RFC. R. at 22. Therefore, the ALJ found, considering the physical and mental demands of this past work and Plaintiff's RFC, that Plaintiff could perform her past work. R. at 23.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff appears to present two claims of error: 1) substantial evidence does not support the ALJ's conclusion that she is not disabled due to her depression; and 2) substantial evidence does not support the ALJ's conclusion that she is not disabled due to her headaches. ECF No. 11 at 2.

## A. The ALJ's Findings of Plaintiff's Depression Under "Paragraph B" Criteria were Supported by Substantial Evidence.

Plaintiff argues that Plaintiff saw Dr. Barchas once a month for major depressive disorder and anxiety during the relevant time period. ECF No. 11 at 2. Plaintiff states that in February, March, and October of 2010 Dr. Barchas recorded Plaintiff's thoughts of suicide. *Id.* Plaintiff also stated she previously attempted suicide in 1992, 2001, 2011, and 2014. *Id.* Plaintiff concedes that the ALJ's findings in the four broad function areas under "paragraph B" criteria were correct for days where she does not experience migraines but argues that when she has migraines those migraines interfere with her daily living. *Id.* Giving *pro se* Plaintiff the benefit of liberal construction, the Court interprets Plaintiff's pleadings to argue that the ALJ's findings of Plaintiff's depression were not supported by substantial evidence.

First, with respect to Plaintiff's argument that when she experiences migraines, her daily living and functioning is affected under "paragraph B" criteria, Plaintiff appears to conflate the ALJ's findings of her depression and anxiety with findings of her migraine headaches. In addressing Plaintiff's anxiety and depression, the ALJ found that when considered singly and/or in combination, these did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and were therefore non-severe. R. at 15. Specifically, using the "paragraph B" criteria to determine the severity of Plaintiff's depression and anxiety, the ALJ found Plaintiff suffered no limitations to activities of daily living; no limitations to social functioning; no limitations to concentration, persistence, and pace; and Plaintiff experienced no episodes of decompensation that have been of extended duration. R. at 15. Because Plaintiff's anxiety and/or depression were not limiting under these "paragraph B" criteria, the ALJ found that Plaintiff's depression and anxiety were only mildly limiting. R. at 16. The ALJ only made

this finding as to Plaintiff's depression and anxiety, having previously determined that Plaintiff's headaches were "severe" and caused "more than minimal limitations in the [Plaintiff]'s ability to perform basic work activities." R. at 14. Plaintiff seems to impute limitations caused by headaches into the ALJ's finding of severity regarding depression and anxiety. Therefore, because Plaintiff concedes that on days she has no migraines the ALJ is correct, and because Plaintiff does not indicate a connection exists between her headaches days and her ability to function due to depression, this argument is without merit.

Second, Plaintiff contests the ALJ's findings of her depression by citing to certain evidence. In giving *pro se* Plaintiff the benefit of liberal construction, the Court has construed Plaintiff's argument as challenging that the ALJ's decision as to Plaintiff's depression is not supported by substantial evidence. On this point, the Court considers only whether there is substantial evidence to support the ALJ's decision. There is substantial evidence if "a reasoning mind would accept [the evidence] as sufficient to support [the ALJ's] conclusion." *Laws*, 368 F.2d at 642. The amount of evidence required is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* If the ALJ's decision about Plaintiff's depression is supported by substantial evidence, then the Court must affirm the ALJ's decision. *Hays*, 907 F.2d at 1456.

Under the first of the "paragraph B" criteria, the ALJ found Plaintiff suffered no limitations to activities of daily living. R. at 15. The ALJ cites to the record and Plaintiff's hearing testimony to support his conclusion, stating that "[Plaintiff] was well dressed and groomed in her examinations . . . was able to perform light housework, care for dogs and care for her children in 2011 . . .[and] was able to prepare simple meals." R. at 15. Plaintiff's hearing testimony and the record is consistent with the facts that serve as the foundation for the ALJ's

decision. *See* R. at 42-56, 1078-1118. Thus, there is substantial evidence to support the ALJ's finding that Plaintiff's daily living activities were not limited by her depression.

For the second of the "paragraph B" criteria, the ALJ found Plaintiff suffered no limitations to social functioning. R. at 15. The ALJ cites to the record and Plaintiff's hearing testimony to support his conclusion, stating that "[Plaintiff] was pleasant and cooperative with her health care providers[,] . . . able to interact with her family and friends[,] . . . could play board games and go on social outings with her family and friends . . . [, and] displayed normal behavior and normal judgment." R. at 15. Plaintiff's hearing testimony and the treatment notes for Plaintiff's depression are consistent with the facts that serve as the foundation for the ALJ's decision. *See* R. at 42-56, 1078-1118. Thus, there is substantial evidence to support the ALJ's finding that Plaintiff's social functioning was not limited by her depression.

For the third functional area of "paragraph B" criteria, the ALJ found Plaintiff suffered no limitations to concentration, persistence, and pace. R. at 15. The ALJ cites to the record and Plaintiff's hearing testimony to support his conclusion, stating that "[Plaintiff] displayed normal concentration and was oriented. She had normal speech and normal intellectual functioning." R. at 15. In support of this conclusion, the ALJ appears to rely on his observations of Plaintiff at the hearing and cites to the observation notes of Dr. Barchas. *See* R. at 42-56, 1078-1118. The transcript of the hearing does not indicate that Plaintiff's concentration, persistence, or pace was limited at least at the time of the hearing. R. at 42-56. The Plaintiff appeared to be able to testify before the ALJ and respond to his questions without asking for a break and without losing her train of thought or responding inappropriately to the ALJ's questions. R. at 42-56. Regarding the treatment notes cited by the ALJ, those records are absent any notation that Plaintiff's depression limited Plaintiff's concentration, persistence, and pace. *See* R. at 1078-1118. Thus,

there is substantial evidence to support the ALJ's finding that Plaintiff's concentration, persistence, and pace were not limited by her depression.

For the last area of functioning, the ALJ found Plaintiff experienced no episodes of decompensation that have been of extended duration. R. at 15. While Plaintiff did experience some significant distress as a result of her depression, R. at 1092 (noting on February 23, 2010, that Plaintiff verbalized thoughts of suicide), this distress was quickly resolved with medication, R. at 1091 (noting that at her next appointment on March 10, 2010, Plaintiff reported that medication had stopped Plaintiff's suicidal thoughts). This appears as the only decompensation-like incident in Plaintiff's mental health treatment records. *See* R. at 1078-1118. Thus, there is substantial evidence to support the ALJ's finding that Plaintiff experienced no episodes of decompensation resulting from Plaintiff's depression that have been of extended duration. Therefore, the Court **FINDS** there is substantial evidence to support the ALJ's finding that Plaintiff's depression was not disabling.

**B. The ALJ's Findings of Plaintiff's Headaches Were Supported by Substantial Evidence.**

Plaintiff argues that she stated to the ALJ and her health providers that she suffers from debilitating migraines multiple days per month. ECF No. 11 at 2. On those days, Plaintiff states she takes Zofran for nausea and Zanaflex, a muscle relaxant, and sleeps in a dark, quiet room. *Id.* Plaintiff argues that throughout 2010 Plaintiff's medical records show she reported having numerous migraines, many of which lasted several days, and in 2011 Plaintiff's medical records show she reported eleven migraines, described as occurring daily. *Id.* Plaintiff argues that the ALJ incorrectly notes that Plaintiff never went to the emergency room for her headaches, as she did go to urgent care on June 10, 2003. *Id.* Plaintiff argues that there are no further visits to the emergency room because Plaintiff prefers self-care of her headaches rather than subjecting

herself to the noise and bright lights of an emergency room for treatment. *Id.* Giving *pro se* Plaintiff the benefit of liberal construction, the Court interprets Plaintiff's pleadings to argue that the ALJ's findings of Plaintiff's headaches were not supported by substantial evidence.

First, Plaintiff contests findings of fact by the ALJ. As a reason for determining Plaintiff's headaches were not disabling, the ALJ noted that Plaintiff did not seek emergency care for her headaches, her headaches improved with medication, and were managed. R. at 21. Plaintiff argues that, despite the ALJ's finding that she did not seek emergency treatment for her headaches, she in fact did seek emergency help for her headaches on June 10, 2003. ECF No. 11 at 2. However, this is outside the period of alleged disability as Plaintiff's alleged onset date is September 1, 2004. R. at 176, 206. There are no medical records to support that Plaintiff made any emergency room or urgent care visits for her headaches after September 1, 2004. R. at 368-423, 467-72, 1334-69, 1372-80, 1381-99. Therefore, this argument is without merit.

Plaintiff further contests the ALJ's findings of her headaches by citing to certain evidence. In giving *pro se* Plaintiff the benefit of liberal construction, the Court has construed Plaintiff's argument as challenging that the ALJ's decision regarding Plaintiff's headaches is not supported by substantial evidence. On this point, the Court considers only whether there is substantial evidence to support the ALJ's decision. There is substantial evidence if "a reasoning mind would accept [the evidence] as sufficient to support [the ALJ's] conclusion." *Laws*, 368 F.2d at 642. The amount of evidence required is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* If the ALJ's decision about Plaintiff's headaches is supported by substantial evidence, then the Court must affirm the ALJ's decision. *Hays*, 907 F.2d at 1456.

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Plaintiff, the ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 20. Specific to Plaintiff's headaches, the ALJ noted that objective medical evidence did not support a finding that they were as limiting as alleged during the relevant period. R. at 21. The ALJ noted that her 2003 pseudotumor was resolved with stenting and her MRIs after that procedure were normal. R. at 21. The ALJ mentioned that Plaintiff's neurologist discontinued intercranial monitoring because her examination showed no evidence of pseudotumor cerebri, her neurological examinations were normal, she reported having "a couple" of alcoholic drinks per night, and she did not continue with Botox injections despite her allegedly chronic migraines. R. at 21. The ALJ determined that Plaintiff's relatively mild findings and lack of treatment cast doubt on Plaintiff's allegations of disability. R. at 21.

There exists substantial evidence to support the ALJ's finding of non-disability related to Plaintiff's headaches. Medical records of Plaintiff's neurological treatment indicate Plaintiff's pseudotumor cerebri and related headaches were resolved by a November 2003 stenting procedure to Plaintiff's right transverse sinus. R at 21, 379-80, 398, 1026. Following this procedure Plaintiff experienced dramatic improvement in her headaches and resolution of papilledema. R. at 398. Plaintiff again experienced headaches after several weeks of relief, but these headaches were admittedly "not that severe," and Plaintiff was "able to function." R. at 1202. After monitoring Plaintiff's cranial pressure for several months, R. at 402, 405-06, Plaintiff's neurologists determined future lumbar puncture procedures were unnecessary and should be discontinued, R. at 411. Plaintiff's neurologist also found all Plaintiff's neurologic,

physical, and visual examinations to be normal.  R. at 397, 399,401, 406, 408, 410, 467, 489-91.

Although Plaintiff has alleged experiencing debilitating headaches, R. at 52, significant evidence

support the ALJ's determination regarding Plaintiff's headaches.  Therefore, the Court **FINDS**

that the ALJ's determination of Plaintiff's headaches is supported by substantial evidence.

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for

Summary Judgment, ECF No. 11, be **DENIED**, the Commissioner's Motion for Summary

Judgment, ECF No. 13, be **GRANTED**, and the final decision of the Commissioner be

**AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific

written objections to the above findings and recommendations within fourteen days from the date

this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C)

and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil

Procedure Rule 6(a).  A party may respond to another party's specific written objections within

fourteen days after being served with a copy thereof.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of

this Report and Recommendation or specified findings or recommendations to which objection is

made.  The parties are further notified that failure to file timely specific written objections to the

above findings and recommendations will result in a waiver of the right to appeal from a

judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S.

140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
December 21, 2018